In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-2219

PLANNED PARENTHOOD GREAT NORTHWEST, HAWAI'I, ALASKA, INDIANA, KENTUCKY, INC.,

*Plaintiff-Appellee*,

*v.*

COMMISSIONER OF THE INDIANA STATE DEPARTMENT OF HEALTH, et al.,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-01636-SEB-CSW — **Sarah Evans Barker**, *Judge*.

ARGUED SEPTEMBER 9, 2025 — DECIDED AUGUST 18, 2026

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In 2017, Indiana passed what we call the "aid-or-assist" law, which forbids knowingly or intentionally aiding or assisting an unemancipated pregnant minor in obtaining an abortion without first satisfying Indiana's parental consent and notice requirements. Ind. Code § 16-34-2-4.2(c). Plaintiff Planned Parenthood provides

to its clients factually accurate information about abortion providers who operate lawfully in other states. Plaintiff provides such information to unemancipated pregnant minors who seek it. Defendants are Indiana state officials who maintain that providing such information violates the aid-or-assist law unless plaintiff can show that it first satisfied the same stringent parental consent requirements that must be satisfied before a minor may obtain an actual abortion.

This appeal is the latest chapter in a long case that has straddled a revolution in the constitutional law relating to terminations of pregnancies. Before the aid-or-assist law took effect, Planned Parenthood sued under the First Amendment to enjoin the law's enforcement as applied to its practices of providing information and referrals to minors. The district court issued a preliminary injunction in 2017, which the state did not appeal on the aid-or-assist law. Seven years later, after the intervening changes in applicable doctrine, the district court issued a careful and thorough opinion explaining why it was imposing a narrower permanent injunction against enforcement of the statute as applied to plaintiff's offering of information or referrals to its minor patients about legal abortion practices and providers in other states. *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky, Inc. v. Commissioner, Indiana State Dep't of Health*, 732 F. Supp. 3d 971, 982 (S.D. Ind. 2024). Defendants have appealed.

We affirm the injunction with one modification. After setting forth relevant facts and procedural background in Part I, we find in Part II that Planned Parenthood has standing to pursue this as-applied, pre-enforcement challenge against the defendant members of the Indiana Medical Licensing Board. In Part III-A, we explain why providing information about or

referrals to legal practices and providers in other states is speech subject to First Amendment protections. In Part III-B, we explain why the state's aid-or-assist law, as applied to the information and referrals at issue, is a content-based restriction on protected speech. Finally, in Part IV, we explain why the aid-or-assist law fails strict scrutiny under the First Amendment as applied to plaintiff's speech.

I. *Factual and Procedural Background*

A. *Senate Enrolled Act 404*

In April 2017, Indiana enacted Senate Enrolled Act 404 (SEA 404). The new law amended several provisions for abortion procedures for unemancipated minors. See Act of Apr. 25, 2017, Pub. L. No. 173-2017, 2017 Ind. Acts 1701–13. This appeal focuses on Section 5 of SEA 404, which prohibits any person from knowingly or intentionally aiding or assisting an unemancipated minor in obtaining an abortion without satisfying the amended parental consent or judicial bypass procedures in Section 4 of SEA 404. Ind. Code § 16-34-2-4.2(c).

Section 4 of SEA 404 requires a physician, before performing an abortion on an unemancipated minor, to obtain: (1) notarized written consent of the minor's parent, legal guardian, or custodian; (2) government-issued proof of identification for the consenting parent, legal guardian, or custodian; and (3) "some evidence" that the consenting individual is actually the parent, legal guardian, or custodian of the unemancipated minor. § 16-34-2-4(b). By incorporating this provision into Section 5, a person who intends to assist an unemancipated minor in any way with obtaining an abortion must comply with these consent requirements or else face liability under the aid-or-assist law.

A violation of the aid-or-assist law can result in civil liability to the unemancipated minor and the minor's parent, legal guardian, or custodian. § 16-34-2-4.2(d). Remedies can include awards of compensatory and punitive damages, as well as attorney fees and court costs.

Indiana statutes also authorize the Indiana Medical Licensing Board to take disciplinary action against a licensed medical practitioner if she "has knowingly violated any state statute or rule … regulating the profession in question." § 25-1-9-4(a)(3). Disciplinary action may include license revocation or suspension, censure, reprimand, probation, and/or a fine. § 25-1-9-9(a).

B. *Plaintiff's Practices*

Plaintiff Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc. is a non-profit corporation that operates eleven health centers in Indiana. At these health centers, it provides a wide range of reproductive and sexual health services to thousands of Indiana residents, including abortion-related services.

When Planned Parenthood is unable to perform the patient's requested abortion services, Planned Parenthood seeks to inform those patients, including minor patients, about neighboring states where those abortion services are available and legal. Planned Parenthood typically shares this information by directing its patients to a particular website where patients can find up-to-date information about lawful abortion services in other states. Other Planned Parenthood locations share handouts that include information on where those abortion services are available. When a patient requests more help, Planned Parenthood seeks to refer the patient to

the out-of-state provider, either by contacting the out-of-state provider in the patient's presence or by contacting the out-of-state provider and having that provider contact the patient directly.

When plaintiff's minor patients tell plaintiff that they may want to obtain an abortion, plaintiff first counsels those patients to discuss the matter with their parents and eventually to obtain parental consent. Some of those minor patients, however, express fears of being kicked out of their homes or being abused or punished by their parents or legal guardians because of their pregnancies. Others simply cannot locate their parent or legal guardian to obtain consent.

Even if plaintiff's minor patients might otherwise be able to satisfy Indiana's parental consent or judicial bypass requirements, some patients might live closer to an abortion provider located across state lines or might seek an abortion service that is significantly less expensive in a neighboring state. Many simply cannot obtain an abortion in Indiana because of Indiana's strict abortion laws. Planned Parenthood seeks to share information about providers that are more convenient for the patient given her circumstances or that are located in states with less stringent abortion restrictions than those of Indiana.

In 2023, in the wake of *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), new restrictions on abortions took effect. Planned Parenthood's health centers no longer provide abortion care in Indiana. See *Members of Medical Licensing Board of Indiana v. Planned Parenthood Great Northwest, Hawai'i, Alaska, Indiana, Kentucky, Inc.*, 211 N.E.3d 957, 985 (Ind. 2023) (vacating preliminary injunction blocking enforcement of Indiana's post-*Dobbs* abortion law). The legal changes in

Indiana have not, however, changed Planned Parenthood's mission to provide information and referrals to both adults and minors about health care, including the availability of legal out-of-state abortion care.

Both sides agree that, without first satisfying Indiana's parental consent law, providing information to minors about or referrals to abortion providers lawfully operating in other states would violate the aid-or-assist law. As a result, Planned Parenthood is concerned that sharing the information will expose it to liability and subject its physicians to prosecution, civil liability, and professional discipline.

C. *Plaintiff's Challenges to SEA 404*

Before SEA 404 took effect in 2017, plaintiff Planned Parenthood filed its initial complaint containing three challenges to provisions of SEA 404. It sought declaratory and injunctive relief. Under the First Amendment, Planned Parenthood challenged the aid-or-assist law as applied to sharing information with its minor patients about abortion options legally available in other states. See Ind. Code § 16-34-2-4.2(c). Planned Parenthood also brought two constitutional challenges to provisions of Section 4, which contains the statute's parental consent requirements. One challenged the requirements that a physician obtain parental identification and then execute an affidavit attesting to the sufficiency of that identification. The other challenged a requirement for parental notice even after a judicial bypass proceeding found the minor to be sufficiently mature to decide independently to obtain an abortion. See § 16-34-2-4(b), (e), & (*l*).

On June 28, 2017, the district court preliminarily enjoined the defendant state officials from enforcing any of the

challenged provisions against plaintiff. Indiana appealed as to only the parental notice provision. The entire injunction stayed in effect through extensive appellate review until after the Supreme Court's 2022 decision in *Dobbs*. See *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, — U.S. —, 142 S. Ct. 2893 (2022) (mem.) (granting certiorari, vacating, and remanding for further consideration in light of *Dobbs*). After post-*Dobbs* abortion restrictions took effect in Indiana in 2023, plaintiff stopped providing abortions in Indiana and withdrew its challenges to the parental notice provision and to the identification and affidavit requirements for parental consent. The First Amendment challenge to the aid-or-assist law is plaintiff's only remaining challenge to SEA 404.

On May 1, 2024, the district court granted summary judgment to Planned Parenthood on its challenge to the aid-or-assist law. The district court first held that the law regulated Planned Parenthood's speech protected under the First Amendment and that the aid-or-assist law amounts to a content-based regulation of speech subject to strict scrutiny. *Planned Parenthood Great Northwest*, 732 F. Supp. 3d at 976–78. The district court found the statute was not narrowly tailored to Indiana's asserted compelling interests as applied to Planned Parenthood's speech. *Id.* at 978–82.

The district court permanently enjoined defendants from enforcing the aid-or-assist law "insofar as it would prohibit Plaintiff and its physicians from disseminating to minors information regarding legal abortion practices and abortion care providers in states other than Indiana and from providing referrals to and contacting out-of-state abortion providers on behalf of their minor patients." *Id*. at 982. This appeal followed.

II. *Standing and Mootness*

Defendants argue first that a portion of this appeal is moot and that plaintiff lacks standing to pursue the remaining portions of this pre-enforcement First Amendment challenge. Defendants have raised these issues for the first time on appeal, but we cannot deem them waived or forfeited. Both challenge our subject matter jurisdiction and thus may be raised on appeal even if they were not disputed in the district court. *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019) (standing); *Friends of the Earth, Inc. v. Laidlaw Env't Services (TOC), Inc.*, 528 U.S. 167, 179–80, 190–92 (2000) (evaluating mootness issue raised for first time by Court of Appeals). Nevertheless, defendants did not dispute plaintiff's evidence relevant to these issues in the district court, so the late challenges take the record as it stands.

We address first plaintiff's claim against defendant Commissioner of the Indiana Department of Health. We then turn to plaintiff's claim against the members of the Indiana Medical Licensing Board.

A. *Mootness of the Claim Against the Commissioner of Health*

Defendants argue that the Commissioner of the Indiana Department of Health is no longer a proper defendant in this suit because changes in Indiana abortion law have removed the Commissioner's ability to provide plaintiff with any relief. We agree, and plaintiff does too.

A case can become moot against a particular defendant if, at any time during the course of litigation, the court cannot order that defendant to provide the plaintiff with "any effectual relief." *Knox v. Service Emps. Int'l Union*, 567 U.S. 298, 307 (2012), quoting *City of Erie v. Pap's A. M.*, 529 U.S. 277, 287

(2000); accord, e.g., *United States v. Segal*, 432 F.3d 767, 773 (7th Cir. 2005). Mootness, like standing, must be considered claim by claim and for each form of relief. *Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005); see generally *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (standing); *Powell v. McCormack*, 395 U.S. 486, 496–97 (1969) (mootness).

When Planned Parenthood filed this suit in 2017, its licensed clinics in Indiana could lawfully provide abortions. Planned Parenthood thus named as a defendant the Commissioner of the Indiana Department of Health, who oversaw licensing of abortion clinics. The district court ordered injunctive relief against the Commissioner. Since then, at the risk of considerable understatement, abortion law has changed significantly.

The Supreme Court ruled in 2022 that the federal Constitution no longer provides a pregnant woman a right to decide whether to continue or terminate a pregnancy. *Dobbs*, 597 U.S. at 231–32, overruling *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). The Indiana General Assembly quickly amended Indiana law to outlaw the vast majority of abortions in the state, allowing abortions only to prevent serious health risks to the pregnant woman and in cases of lethal fetal anomaly, rape, or incest. See Act of Aug. 5, 2022, Pub. L. No. 179-2022(ss), § 21, 2022 Ind. Acts 2595, 2608–11, amending Ind. Code § 16-34-2-1.

The new law also required that any lawful abortions be performed in hospitals or ambulatory surgical centers. That change effectively prohibited plaintiff from performing any abortions in its Indiana clinics. See *id.* As a result, Planned Parenthood and its clinics no longer hold valid licenses to

perform abortions and no longer face the threat of any licensing sanctions from the Commissioner. We agree with the parties that these changes in state law have removed the Commissioner's ability to provide any relief to plaintiff. As a result, we modify the injunction so that it no longer runs against the Commissioner of Health.

B. *Injunctive Relief Against the Medical Licensing Board*

Plaintiff also won injunctive relief against the members of the Indiana Medical Licensing Board to prevent licensing discipline of plaintiff's physicians based on their providing information and referrals prohibited by the aid-or-assist law. The defendants argue plaintiff lacks standing to pursue this relief. We explain first why plaintiff has standing against these defendants and then turn to defendants' more specific challenges.

1. *Plaintiff's Case for Standing*

Standing requires at least three elements: an injury that is actual or imminent, a causal connection between the conduct complained of and the actual or imminent injury, and a likelihood that a favorable decision would redress or prevent the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiff's case for standing against the Board members is straightforward. First, the Board is responsible for regulating and disciplining physicians in Indiana. The Board can impose disciplinary sanctions against a licensed medical practitioner if she "has knowingly violated any state statute or rule … regulating the profession in question." Ind. Code § 25-1-9-4(a)(3). Disciplinary sanctions can include license revocation or suspension, censure, reprimand, probation, and/or a fine. § 25-1-9-9.

Defendants have argued in the district court and on appeal that disseminating information about lawful out-of-state abortions to unemancipated minors would violate the aid-or-assist law. Physicians who work for Planned Parenthood thus risk disciplinary action by the Indiana Medical Licensing Board. Planned Parenthood seeks an injunction so that its physicians can carry out the plaintiff's purposes by providing information about legal abortions in other states without fear of losing their licenses or other disciplinary actions. The district court's injunction redresses Planned Parenthood's injury by protecting its physicians from punishment for providing this information. All three elements of standing under *Lujan* are satisfied here with respect to imminent injury.

One feature of standing in this case requires us to make explicit what is often left implicit in organizational standing cases. Like other corporations, Planned Parenthood has its own free speech rights. See *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 342 (2010); *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 474 (7th Cir. 2012). When those rights are sufficiently chilled, a corporate plaintiff can establish standing to challenge a law that prohibits its speech. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012) ("The plaintiff must substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief."). A legal abstraction like a corporation can act only through human agents, such as licensed physicians and other employees in this case.

A corporate or organizational plaintiff can establish standing to challenge a law arguably infringing its First Amendment rights even when the consequences of any violation might fall most immediately and directly on the

corporation's employees rather than on the corporation itself. See, e.g., *Allee v. Medrano*, 416 U.S. 802, 819 n.13 (1974) (union had standing to challenge Texas statutes where union acted only through its members and its members faced intimidation and arrest under statutes for engaging in constitutionally protected union activity); *id*. at 829 (Burger, C.J., concurring in the result in relevant part); see also *Whole Woman's Health v. Jackson*, 595 U.S. 30, 45–48 (2021) (plurality) (reproductive healthcare clinic could pursue pre-enforcement challenge to abortion law based on risk that members of medical licensing board could take action against employees to punish violations of law); *id.* at 59–60 (Roberts, C.J., concurring in the judgment in relevant part); *id.* at 63 (Sotomayor, J., concurring in the judgment in relevant part). This conclusion seems so obvious that it is usually left implicit where the corporation is the employer and its employees face prosecution or other legal penalties for carrying out their employer's missions or policies.

That's the situation here. Planned Parenthood asserts its own First Amendment rights, but it necessarily exercises those rights through its employees and other agents. Planned Parenthood itself does not have a physician's license, but it will suffer an injury if fear of official licensing discipline discourages its employees and agents from engaging in the organization's work. Given these familiar roles for an employer and its employees and for other principals and agents, it follows that this type of harm is sufficient to confer standing upon plaintiff.

A helpful example in a similar context is *Citizens for a Better Environment, Inc. v. Nassau County*, 488 F.2d 1353 (2d Cir. 1973). There, local police enforced anti-solicitation ordinances

against a nonprofit's employees for engaging in the nonprofit's door-to-door educational and fundraising campaign. The organization sought injunctive relief preventing future enforcement of those laws against its employees. *Id.* at 1355. The Second Circuit recognized that the organization itself had standing to pursue this injunctive relief. The organization's "very existence as a soliciting organization is obviously threatened by the fact that the police intend to continue to invoke the solicitation ordinances against its employees." *Id.* at 1361. Similarly here, Planned Parenthood cannot exercise its First Amendment rights without its employees taking actions that would arguably violate the challenged statute and risking professional discipline. So the same finding of standing applies.

2. *Redressability and Incomplete Relief*

Defendants raise two more specific objections to plaintiff's standing to seek relief against the Board members. The first focuses on the fact that the aid-or-assist law is enforceable through private civil actions that are not affected by the district court's injunctions.

The aid-or-assist law allows a civil suit against a person who "knowingly or intentionally aid[s] or assist[s] an unemancipated pregnant minor in obtaining an abortion" without complying with the statute's detailed requirements for parental consent. Ind. Code § 16-34-2-4.2(c)–(d). The unemancipated pregnant minor and her parent, legal guardian, or custodian may win compensatory damages, punitive damages, attorney fees, and court costs. § 16-34-2-4.2(d). A parent, legal guardian, or custodian of an unemancipated minor may also seek an injunction against conduct that would violate the statute. § 16-34-2-4.2(f).

The injunction here runs against only public officials, including the members of the Medical Licensing Board. It does not, by its terms, protect Planned Parenthood or its employees from any private lawsuits authorized by the aid-or-assist law. How, after all, could plaintiff know whom to sue, and how could a district court know whom to enjoin? The district court's injunction thus does not completely remove the possibility that Planned Parenthood could still face civil liability—if a private party sued under the aid-or-assist law, and if the Indiana court disagreed with the district court's and our decisions here.[1]

One indispensable element of Article III standing is that it must be likely that plaintiff's alleged injury would be redressed or prevented by a favorable decision. *Lujan*, 504 U.S. at 561. Defendants argue that the private enforcement mechanism in Indiana's aid-or-assist law means that the injunction cannot actually redress or prevent the First Amendment injury that Planned Parenthood fears.

This argument misunderstands the redressability prong of standing doctrine. Redressability does not require the plaintiff to "show that a favorable decision will relieve his *every*

---

[1] The Texas Heartbeat Act (Senate Bill 8) took effect in 2021. It banned most abortions after the detection of a fetal heartbeat and relied heavily on civil enforcement by private parties. Even before *Dobbs*, the Supreme Court declined to stay Senate Bill 8's novel private enforcement mechanism. *Whole Woman's Health*, 595 U.S. at 44–45 (plurality). The Supreme Court nevertheless permitted the pre-enforcement challenge to proceed against individual state licensing officials with disciplinary authority over medical providers. Eight Justices agreed the suit could go forward against those defendants. *Id.* at 45–48 (plurality), 59–60 (Roberts, C.J., concurring in the judgment in relevant part), 63 (Sotomayor, J., concurring in the judgment in relevant part). We follow a similar course here.

injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original), quoted in *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007). Redressability is not meant to be an onerous obstacle to standing. Where a plaintiff seeks monetary relief, "[e]ven 'one dollar' of additional revenue" can be enough to show redressability. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025), quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021). It is enough that a plaintiff's requested relief would redress "at least some" of her injuries, even if the relief might not wholly eliminate them. *Id.*; *Brown v. Kemp*, 86 F.4th 745, 770 (7th Cir. 2023) (injunction preventing named defendants from enforcing statute satisfied redressability even if "a few rogue law enforcement officers might still mistakenly try to enforce" challenged statute).

In other words, Article III standing does not require a plaintiff seeking an injunction against enforcement of a statute to sue *all* defendants who might possibly enforce the statute against that plaintiff in the future. The possibility of private enforcement—and the record does not indicate that any efforts have been made since public enforcement of the aid-or-assist law was first enjoined in 2017—does not defeat standing against members of the Indiana Medical Licensing Board. The injunction prevents members of the Board from taking disciplinary action against physicians who work for plaintiff and thus protects its employees and plaintiff itself from this particular harm. That's sufficient to show redressability.

3. *Pre-enforcement Standing*

Defendants' second more specific standing argument is that Planned Parenthood and its physicians have not yet faced a sufficiently credible threat of public enforcement. As noted,

this is a pre-enforcement, as-applied First Amendment challenge to the aid-or-assist law. Such a challenge requires a plaintiff to show injury-in-fact in at least one of two ways. First, a plaintiff may show "an intention to engage in a course of conduct arguably affected with a constitutional interest," coupled with a "credible threat" that the law prohibiting such conduct will be enforced against him. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Second, a plaintiff may show "a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).

Defendants focus on the first prong of this test but do not address the second. Planned Parenthood has established standing under that second prong based on its evidence of the law's chilling effects on protected expression. Plaintiff presented substantial uncontested evidence about the services it provides, including details about its intent to continue providing unemancipated minors with information about abortion services that are lawful in other states. Defendants insist that providing that information is prohibited by the aid-or-assist law.

Planned Parenthood's mission includes advocating for the rights of its patients to obtain abortion services, "including abortion services in other states even when an abortion may not be lawful in Indiana." Declaration of K. Smith ¶ 28. Planned Parenthood's evidence supporting its motion for summary judgment explained that, even if a broad abortion ban took effect in Indiana, Planned Parenthood would still "continue to operate health centers throughout Indiana that provide reproductive health services other than abortion, including to unemancipated minors." *Id.* ¶ 25. Plaintiff specified

that its continued reproductive services would include "pregnancy tests and other pregnancy-related services as well as referrals for abortion care." *Id.* If a state abortion ban were to take effect, Planned Parenthood noted, sharing this information would "become even more important and more frequent" in the organization's practice. *Id.* ¶ 26.

Defendants have not disputed plaintiff's theory of standing: a physician who provides this information without complying with the statute's detailed parental consent requirements would be subject to professional discipline. Plaintiff offered evidence that it is "extremely concerned that, if these statutes take effect, its physicians may be prosecuted or have actions taken against their license, or [plaintiff] itself will be subject to adverse consequences … The possibility of criminal liability or licensing sanctions for a perceived violation is of particular concern given the politicized nature of abortion services." *Id.* ¶ 14.[2]

In a variation on this argument, defendants also suggest that fear of licensing sanctions for physicians does not support standing because the individuals who share information or provide referrals regarding lawful out-of-state abortions are plaintiff's non-medical staff, not its physicians. This argument is not persuasive as a matter of fact.

Defendants base this argument on Planned Parenthood's general language referring to its "employees" and "staff" in

[2] This is not a hypothetical concern. See, e.g., *In re Rokita*, 219 N.E.3d 733, 733–35 (Ind. 2023) (Indiana Attorney General admitted two violations of attorney disciplinary rules after making false, nationally televised accusations of misconduct against physician who provided lawful abortion services).

its district court briefs. Defendants contend that plaintiff can show a threat of enforcement actions against its physicians only by proving its licensed physicians personally share this information about, or make referrals for, lawful abortions in other states. The physicians are "employees" and "staff." We find no support for defendants' theory that general references to "employees" excluded physician employees. Defendants recognized as much in their January 2023 brief on cross-motions for summary judgment, acknowledging that Planned Parenthood contended its physicians personally advise minors on how to obtain lawful abortions in other states. Dkt. No. 89 at 17.[3]

Accordingly, plaintiff's evidence shows a sufficiently concrete "threat of an imminent future injury" required for standing to bring a pre-enforcement First Amendment challenge to a law. *Brown v. Kemp*, 86 F.4th at 761, citing *Lujan*, 504 U.S. at 560; accord, e.g., *Chiles v. Salazar*, 607 U.S. —, —, 146 S. Ct. 1010, 1019 & n.* (2026) (licensed mental-health counselor had standing for pre-enforcement challenge to state restriction on

---

[3] As a matter of law, the defense argument is also at least doubtful. State regulations provide: "A practitioner shall be responsible for the conduct of each and every person employed by the practitioner … for every action or failure to act by said employee or employees in the course of said employee's employment relationship with said practitioner …." 844 Ind. Admin. Code § 5-2-12. Other employees of plaintiff may not be "employed by the practitioner" but would be supervised by the practitioner. The parties have not cited, and we have not found, clear guidance in Indiana law about how the Indiana Medical Licensing Board deals with employee-physicians' failures to supervise other employees so as to ensure compliance with the law. We need not resolve this issue because the factual record here shows that the aid-or-assist law would have a chilling effect on arguably protected speech of the licensed physicians.

therapy provided to minors on issues of sexual orientation and gender identity); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–67 (2014) (plaintiff that had been charged with prior violation of law showed sufficient threat of future enforcement action).

In sum, Planned Parenthood presented undisputed evidence sufficient to establish its standing to seek and win injunctive relief against members of the Indiana Medical Licensing Board.

III. *The Merits of the Permanent Injunction*

Turning to the merits of plaintiff's First Amendment challenge to the aid-or-assist law, we proceed as follows. In Part III-A, we explain why the First Amendment protects the information plaintiff seeks to provide about lawful abortion services in other states. We reject the defense arguments that the speech is "integral to unlawful conduct" and that the speech is merely "incidental" to conduct. In Part III-B, we explain why the aid-or-assist law amounts to a content-based and viewpoint-based restriction on speech that is subject to strict constitutional scrutiny, meaning the state must show the restriction is narrowly tailored to serve compelling state interests. In Part IV, we apply that strict scrutiny and explain why we agree with the district court that the aid-or-assist law, as applied to plaintiff, fails to satisfy that demanding test.

A. *Speech Protected Under the First Amendment*

We first address whether the information and referrals at issue are entitled to any First Amendment protection at all. Defendants argue that First Amendment protections do not apply here on the theories that the information and referrals are "speech integral to criminal conduct" or merely

"incidental" to conduct. We are unpersuaded by both arguments. The aid-or-assist law, as applied to the information and referrals at issue, is a content-based regulation of speech.

1. *Speech Integral to Unlawful Conduct?*

Defendants contend that Planned Parenthood's speech about lawful abortion services in other states should not receive First Amendment protection because it falls within a historically excepted category for speech intended to bring about unlawful conduct. *United States v. Williams*, 553 U.S. 285, 298 (2008); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). This category of speech falls outside First Amendment protection because "[s]peech intended to bring about a particular unlawful act has no social value." *United States v. Hansen*, 599 U.S. 762, 783 (2023), citing *Williams*, 553 U.S. at 298. In this case, defendants do not identify a valid underlying offense that is not the challenged statute itself. Plaintiff's speech does not fall within this exception to First Amendment protection.

Following the Supreme Court's lead, we assume for purposes of this analysis that this exception encompasses speech integral to conduct unlawful under civil as well as criminal law. See *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388–89 (1973) (exception applied to newspaper advertisements for jobs organized by sex so as to encourage illegal sex discrimination in hiring). For aiding-and-abetting liability, precedent has long recognized that "the concept of 'helping' in the commission of a crime—or a tort—has never been boundless." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488 (2023). The fear of ensnaring innocent bystanders is high.

Instead, aiding-and-abetting liability requires intentional participation intended to bring about the commission of the underlying offense. *Rosemond v. United States*, 572 U.S. 65, 71 (2014). This exception requires that the speech at issue be tied to, and in furtherance of, the "violation of a valid … statute." *Giboney*, 336 U.S. at 498. Defendants argue that Planned Parenthood's speech falls into this exception because the information and referrals violate the aid-or-assist law itself, which prohibits intentionally helping minors obtain abortions without first complying with Indiana's parental consent requirements. This argument is of course circular: the speech is integral to unlawful conduct because the challenged restriction on speech makes it unlawful. In other words, the theory goes, the speech is illegal because it is illegal.

This exception to First Amendment protection demands more. It demands a separate underlying offense that is not the challenged restriction on speech itself. See *Hansen*, 599 U.S. at 783 (collecting cases where this exception applies, all of which involve the violation of a separate statute); *Matsumoto v. Labrador*, 122 F.4th 787, 813–14 (9th Cir. 2024) (rejecting argument that a violation of the challenged statute can serve as "both the 'underlying offense' and the exception to otherwise protected speech"); Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 987 (2016) ("[T]he *Giboney* doctrine can't justify treating speech as 'integral to illegal conduct' simply because the speech is illegal under the law that is being challenged."). A broader reading of the exception would undermine First Amendment rights by shielding any statute that criminalizes speech from strict scrutiny solely because the legislature made such speech criminal.

To be clear, we can assume that speech aiding an unemancipated minor in obtaining an illegal abortion *in Indiana* would constitute speech integral to criminal conduct, violating Indiana's near-total abortion ban. See Ind. Code § 16-34-2-1. But Planned Parenthood's practice of providing information and referrals to out-of-state abortion providers operating lawfully in other states does not go so far. Defendants do not point to a violation of any other statute, other than the aid-or-assist law itself, as the basis for this exception.

Nor can an abortion performed lawfully in another state serve as the underlying offense. The district court's injunction protects only speech aimed at conduct occurring in other states—crucially—where that conduct is *legal*. *Planned Parenthood Great Northwest*, 732 F. Supp. 3d at 982. Because the district court's injunction applies only to information about providers who operate lawfully, there is no predicate criminal offense to which the speech could be said to be integral.[4]

---

[4] Our analysis here is consistent with *K.C. v. Individual Members of Medical Licensing Board of Indiana*, 121 F.4th 604 (7th Cir. 2024). In that case, we reversed a preliminary injunction against enforcement of an Indiana law prohibiting medical practitioners from providing gender transition care to minors, regardless of the views of the minors' parents. Among the issues in the case, the physician plaintiffs brought a First Amendment challenge to the "secondary liability provision" of the statute, which provides that a physician or practitioner "may not aid or abet another physician or practitioner in the provision of gender transition procedures to a minor." Ind. Code § 25-1-22-13(b). That portion of the case was similar to this case because the physician plaintiffs sought to refer patients to other physicians and to discuss with patients and their families "where and to what extent gender transition procedures are available." 121 F.4th at 628.

Indiana's parental consent and abortion requirements for minors simply do not apply to the activities of out-of-state providers. A state does not have the power to regulate or prohibit lawful activities in another state "merely because the welfare and health of its own citizens may be affected when they travel to that State." *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975). Any contrary argument disturbs long-held principles of horizontal federalism that confine a state's legislative and police powers to within its own borders. See *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 420–23 (2003) (state jury could not award punitive damages based on defendant's nationwide course of conduct legal in other states: "A State cannot punish a defendant for conduct that may have been lawful where it occurred."); *id.* at 421–22 (collecting supporting cases); *Huntington v. Attrill*, 146 U.S. 657, 669, 686 (1892) (state could not refuse to honor other state's civil judgment on ground it imposed penalty inconsistent with receiving state's laws: "Laws have no force of themselves beyond the

---

But unlike this case, the physician plaintiffs in *K.C.* did *not* limit their challenge to providing information about providers in other states where these services are legal. *Id.* at 631 ("[Appellees] do not limit their challenge, as the dissent says, to SEA 480's bar on aiding and abetting out-of-state providers."). In other words, the *K.C.* majority understood the plaintiffs to be challenging a ban on providing information about gender transition care in Indiana that would be illegal in Indiana. Premised on the lack of such a limit, this court found the plaintiffs' speech was unprotected under the "speech integral to unlawful conduct" exception. *Id.* at 629–31. The *K.C.* majority did not decide the sort of question we face here, whether the state may prohibit informing patients or clients about health care that is legal *in other states*. The dissenting judge in *K.C.* understood the Indiana law as not prohibiting such speech about care that is legal in other states, which she understood was protected speech, not speech integral to unlawful conduct. *Id.* at 644–45 (Jackson-Akiwumi, J., dissenting).

jurisdiction of the state which enacts them, and can have extraterritorial effect only by the comity of other states.").

Nevertheless, defendants assert, it should be enough that the information and referrals are provided in Indiana and that such speech impedes the purpose of the statute: to protect parents' interests in and responsibilities for their children's well-being. Those state interests are legitimate, of course, as we explain below in applying strict scrutiny. But that purpose does not transform Planned Parenthood's actions—providing factually accurate information about and referrals to out-of-state providers who lawfully provide abortions in their states—into an independent crime. Indiana officials may disagree with the purposes behind plaintiff's speech and with the laws and policies of other states. They cannot, however, make it illegal to provide information about lawful conduct in other states. Nor can they apply Indiana's own parental consent laws to out-of-state abortions. See *Bigelow*, 421 U.S. at 824–25, 827–28. As a result, defendants cannot prevail on the theory that plaintiff's activity violates the aid-or-assist law two times over so that First Amendment protections do not apply at all.

2. *Speech Incidental to Conduct?*

In a broader argument, defendants also contend that Planned Parenthood's speech receives no First Amendment protection because the speech is merely incidental to conduct generally. Defendants claim that the aid-or-assist law, with ancillary effects on speech, targets conduct: aiding an unemancipated minor in obtaining an abortion without certain parental consent. It is "true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health*

*Inc.*, 564 U.S. 552, 567 (2011). But we disagree with defendants that this speech is only incidental. The statute, as applied to plaintiff's speech about lawful abortions in other states, burdens protected speech.

In an as-applied First Amendment challenge, we look not at the broad applications of the challenged law generally but specifically at whether the law as applied targets plaintiff's speech. *Chiles*, 607 U.S. at —, —, 146 S. Ct. at 1021–22, 1024. In other words, our review in this as-applied challenge is more searching than whether the statute generally covers non-speech conduct. The dispositive question is whether "the conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).

Defendants assert that the aid-or-assist law "is concerned with what people do, not what they say," and that the law applies only incidentally to some speech. That description fails to engage with the narrow focus of plaintiff's as-applied challenge and the narrow focus of the district court's injunction. In many situations, the aid-or-assist law may apply generally as a regulation of conduct. But the activities at issue here—providing information and referrals to plaintiff's patients—very much "depend[] on what [plaintiff] say[s]." *Id.* at 27.

The Supreme Court's recent decision in *Chiles v. Salazar* confirms the proper framework for applying the speech-incidental-to-conduct doctrine to as-applied challenges. See 607 U.S. at —, 146 S. Ct. at 1020–26. Colorado adopted a law prohibiting licensed counselors from practicing "conversion therapy" in any form with minors. A Colorado mental health counselor sought injunctive relief against the law's

enforcement, specifically as applied to the talk therapy she engaged in with her minor patients. *Id.* at —, 146 S. Ct. at 1018. The state argued that the law targeted conduct or treatment, but the Court disagreed.

Citing *Cohen* and *Holder*, the Court concluded that, even though the law might often regulate conduct, "[plaintiff] seeks to engage only in speech, and as applied to her the law regulates what she may say. Her speech does not become conduct just because the State may call it that." *Id.* at 1023; see *Cohen v. California*, 403 U.S. 15, 16–18 (1971) (defendant's breach-of-the-peace charge depended on vulgar message displayed on his jacket; Court analyzed generally applicable statute as it pertained to facts of violation); *Holder*, 561 U.S. at 27–28 (plaintiffs challenged "material support" statute as applied to content of their training and advice; Court rejected government's argument that law did not warrant strict scrutiny because it generally regulated conduct). Defendants here ask us to look at the aid-or-assist law in its full range of applications, but *Chiles* and its predecessors require a narrower focus on plaintiff's as-applied challenge.

The aid-or-assist law targets plaintiff's speech directly because the information and referrals, Indiana says, fall within the statute's prohibitions. Defendants point to *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, where the Court held that an equal-access statute generally regulated conduct, not speech. 547 U.S. 47, 60 (2006). That law denied federal funding to universities with policies that limited military recruiters' access to students and campus *as compared to other employers*. The implicated speech in *Rumsfeld*, therefore, was held to be incidental to conduct because schools were required to act under the statute—for example, by sending an

email on behalf of a military recruiter—only to the extent they performed such conduct for other recruiters. *Id.* at 62. In another example, the speech-incidental-to-conduct exception applies where a non-discrimination statute would "require an employer to take down a sign reading 'White Applicants Only.'" *Id.*

The challenge here is altogether different. Planned Parenthood specifically brings an as-applied challenge, seeking to share with unemancipated minors information about and referrals to legal out-of-state abortion providers. It is undisputed that such speech, on its own, would trigger liability under the statute. So plaintiff's speech cannot be merely incidental to conduct; the regulated speech is itself the targeted activity.

Our analysis here is also consistent with our treatment of this exception in *K.C. v. Individual Members of Medical Licensing Board of Indiana*, our recent case involving Indiana's regulation of gender transition care to minors. We said in *K.C.* that, as a fallback to our analysis of the "speech integral to unlawful conduct" exception, the statute's liability provision targeted conduct and burdened speech only incidentally. 121 F.4th at 629. We focused on *Expressions Hair Design v. Schneiderman*, which properly cabined its analysis as to whether the statute regulated conduct or speech based on the plaintiffs' as-applied challenge. 581 U.S. 37, 44, 46–48 (2017).

In *Schneiderman*, a statute prohibited a merchant from imposing a credit card fee on its customer, but merchants challenged the statute only insofar as they sought to "post[] a cash price and an additional credit card surcharge" on, for example, signs in their stores. *Id.* at 41, 44. The Supreme Court found that plaintiffs' as-applied challenge dealt only with the

communication of prices rather than the imposition of the prices themselves. The prohibition on posting the credit card surcharge regulated speech. By way of comparison, the Court explained that a typical price regulation requiring, for example, all delicatessens to charge the same price for a sandwich would be a regulation of conduct—and communication of that uniform rate would be speech incidental to conduct. *Id.* at 47.

We found the statute challenged in *K.C.* to be more like the hypothetical in *Schneiderman*. But our analysis did not hinge on the as-applied nature of the challenge or on precedents evaluating the speech-incidental-to-conduct exception in an as-applied posture.

Here, however, Planned Parenthood's as-applied challenge addresses *only* speech providing information about care that is *lawful* in other states. That limit both distinguishes this case from *K.C.* and confirms that the as-applied analysis in *Chiles* governs. The permanent injunction is limited to "disseminating to minors information regarding *legal* abortion practices and abortion care providers *in states other than Indiana* and from providing referrals to and contacting *out-of-state* abortion providers on behalf of their minor patients." (Emphases added.) As applied to only those narrow categories of information, the aid-or-assist statute "regulates 'speech as speech.'" *Chiles*, 607 U.S. at —, 146 S. Ct. at 1026, quoting *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755, 770 (2018).

The information and referrals at issue here are thus pure speech. The information Planned Parenthood seeks to share, whether the speech includes the name of a website or information contained in an informational handout, is plainly

speech. *NIFLA*, 585 U.S. at 766 (statutory requirement that certain providers disseminate a notice regarding affordable reproductive care to patients was content-based regulation of speech); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("As the majority below put it, 'if the acts of "disclosing" and "publishing" information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.'") (alteration omitted), quoting 200 F.3d 109, 120 (3d Cir. 1999).

Plaintiff's referrals for minors are also protected speech. For referrals, Planned Parenthood seeks to "contact … an out-of-state abortion provider, either by contacting the out-of-state provider in the minor's presence or by contacting the out-of-state provider and having that provider contact the patient directly." Smith Decl. ¶ 21. Such contact undoubtedly requires plaintiff to communicate a message both to the minor and to the out-of-state provider, which is not just incidental to plaintiff's conduct. See *Chiles*, 607 U.S. at —, 146 S. Ct. at 1020–23 (mental health counselor's conversion "talk therapy" on issues of sexual orientation and gender identity was protected speech; restrictions subject to strict scrutiny). Advising a person of her legal rights and referring her to someone who can help her exercise her rights is protected speech. *Valley Family Planning v. North Dakota*, 489 F. Supp. 238, 242 (D.N.D. 1980) (state statute prohibiting use of public funds to support any entity that referred patients for abortions violated First Amendment), *aff'd*, 661 F.2d 99 (8th Cir. 1981), citing *NAACP v. Button*, 371 U.S. 415, 434–35 (1963) (state prohibition on referring clients to attorneys violated First Amendment as applied to organization that promoted civil rights enforcement). As the Supreme Court said in *NAACP v. Button*, "'Free trade in ideas' means free trade in

the opportunity to persuade to action, not merely to describe facts.'" 371 U.S. at 437, quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945). Planned Parenthood does not try to persuade anyone to have an abortion. Its lesser steps of providing information and referrals so clients can make their own decisions are similarly protected speech.

B. *Content-Based Regulation*

Having concluded that plaintiff's speech is protected under the First Amendment, we consider next whether, as applied to that speech, the aid-or-assist law is a content-based or content-neutral law. A regulation of speech is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed," or "'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), quoting *Sorrell*, 564 U.S. at 564. Regulations "that suppress, disadvantage, or impose differential burdens upon speech because of its content" are content-based and therefore subject to strict scrutiny. *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642 (1994). On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Id.* at 643. As applied to plaintiff's speech, the aid-or-assist law is content-based.

Again, the aid-or-assist law provides that a person "may not knowingly or intentionally aid or assist an unemancipated pregnant minor in obtaining an abortion without the consent required by section 4 of this chapter." Ind. Code § 16-34-2-4.2(c). While the statute does not mention speech on its face, plaintiff's speech is covered by this law because of its subject matter. The statute targets any activity,

including speech, that aids minors in obtaining an abortion without first satisfying Indiana's parental consent laws. See *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The principal inquiry in determining content neutrality … is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.").

If plaintiff shares information with pregnant minors about out-of-state care for prenatal care or ovarian cancer or sexually transmitted infections, the aid-or-assist law is no obstacle. But if the information shared or the referral made concerns abortion, the statute is triggered. Because defendants maintain that plaintiff and its employees would violate the law by continuing to share the information and referrals for legal out-of-state abortion care, the statute turns on the message the speaker conveys even if it seems facially neutral. See *Reed*, 576 U.S. at 163–64.

Viewpoint discrimination is a particularly "egregious form of content discrimination" that targets "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); accord, *Chiles*, 607 U.S. at —, 146 S. Ct. at 1021 (recognizing "the even greater dangers associated with regulations that discriminate based on the speaker's point of view;" making "the violation of the First Amendment … all the more blatant"). The aid-or-assist law is not viewpoint-neutral. It prohibits speech to the extent that it aids an unemancipated minor in obtaining an abortion without specific parental consent. In doing so, the statute as applied to plaintiff prohibits speech of the view that an unemancipated minor would benefit, for a variety of reasons, from the information or referrals shared, while permitting speech with the opposite viewpoint. "In its practical

operation," the aid-or-assist law thus allows conversations on the subject of abortion but forbids a certain point of view. See *Sorrell*, 564 U.S. at 565, quoting *R. A. V. v. City of St. Paul*, 505 U.S. 377, 391 (1992).

Our analysis here is consistent with the Ninth Circuit's decision affirming a preliminary injunction against enforcement of a similar Idaho law punishing any health care professional who "assists in performing or attempting to perform an abortion." *Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 832 (9th Cir. 2024). The state attorney general wrote an official letter interpreting the word "assist" to prohibit "medical providers from 'refer[ring]' a patient 'across state lines to an abortion provider.'" *Id.* (alteration in original). The Ninth Circuit found that the letter discriminated based on content because it "silence[d] healthcare providers on the specific topic of abortion." *Id.* at 844. The letter also discriminated by viewpoint by singling out professionals who believed "that abortion services in another state would likely help a patient." *Id.* The same reasoning applies here.

Defendants argue that the actual content of the speech is not relevant because plaintiff may share information or referrals after complying with the Indiana parental consent law that applies when a minor actually obtains an abortion. Even apart from that law's rigorous requirements, this argument misses the First Amendment point. Whether the parental consent requirements apply depends on the content and viewpoint of the speech in question. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech."

*Reed*, 576 U.S. at 165, quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993). Just because defendants may approve of plaintiff's speech when consent requirements have been met does not "transform a facially content-based law into one that is content neutral." *Id.* at 166.

IV. *Applying Strict Scrutiny*

A. *The Demands of Strict Scrutiny*

When a statute imposes a content-based restriction on pure speech, courts apply strict scrutiny. *Sorrell*, 564 U.S. at 565–66. Such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. As a practical matter, strict scrutiny is "fatal in fact absent truly extraordinary circumstances." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 485 (2025). *Holder* was a rare exception. See 561 U.S. at 39 (federal statute banning "material support" to terrorist organizations upheld under strict scrutiny as applied to plaintiffs' proposed forms of training, advice, and assistance).

At the outset of our analysis, we must focus on *Bigelow v. Virginia*, 421 U.S. 809 (1975). Bigelow ran a newspaper in Virginia. In 1971, before the Supreme Court recognized a limited constitutional right for pregnant women to obtain abortions, he had run an advertisement that told readers in Virginia that abortions were legal in New York. The advertisement provided contact information for counseling to arrange for a legal abortion in New York. Bigelow was convicted of violating a Virginia statute that made it a crime to encourage the procuring of an abortion. *Id.* at 811–14. The Supreme Court reversed, holding that the First Amendment protected publication of

the advertisement. The Court explained that a state "may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Id.* at 824–25, 829.

*Bigelow* would clearly control an effort by Indiana to restrict the flow of factually accurate information to adults about abortion care that is legal in other states. Defendants seek to distinguish *Bigelow* on the basis that Indiana's aid-or-assist law applies only to information that plaintiff provides to minors. Defendants write that "States have greater leeway to protect children's wellbeing." Reply Br. at 14–15, citing *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) (upholding criminal convictions for violating state law restricting child labor when child was employed to sell religious magazines).

That general principle is surely sound, especially as applied to child labor, as the Court explained in *Prince*. 321 U.S. at 168 (state's authority over children's activity is broader than for adults, which is "peculiarly true of public activities and in matters of employment"). But authority over activity is very different, for First Amendment purposes, from restricting the flow of information.

The advertisements in *Bigelow* appear to have been equally available to adults and to minors. The *Bigelow* opinion did not address whether its reasoning would extend to advertising directed specifically at minors. Nevertheless, the Supreme Court has struck down other restrictions on providing information or entertainment to minors, with the lone exception of pornography. In *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011), the Supreme Court applied strict scrutiny to hold that a state statute prohibiting the sale or rental of violent video games to minors violated

the First Amendment. The Court recognized that states may restrict the sale of explicit sexual material to children. *Id.* at 792–94, citing *Ginsberg v. New York*, 390 U.S. 629, 638 (1968) (definition of obscenity could be adjusted for minors). But the *Brown* Court rejected the effort to broaden *Ginsberg* to violent materials. The Court called California's effort to create a new category of regulations for speech directed at children "unprecedented and mistaken. '[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them.'" *Id.* at 794 (alteration in original), quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975) (striking down ordinance making it an offense for a drive-in movie theater to exhibit films containing nudity). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795, again quoting *Erznoznik*, 422 U.S. at 213–14; accord, *American Amusement Machine Ass'n v. Kendrick*, 244 F.3d 572 (7th Cir. 2001) (rejecting ordinance applying pornography standards to violent video games; enjoining ordinance requiring video arcades to require parent or guardian to accompany minor who played violent video games). That reasoning in both *Brown* and *American Amusement* weighs against efforts to deny minors the benefit of *Bigelow v. Virginia*.

Before parsing the specific asserted interests and the narrow-tailoring issues, we must note that defendants have not identified *any* comparable cases allowing restrictions on providing accurate information to adults or minors about activities that are legal in other states. That absence, and the

rarity of laws surviving strict scrutiny, indicate that the state defendants have at best a steep hill to climb.

We next identify Indiana's averred compelling interests advanced by applying the aid-or-assist statute to information about and referrals to health care legally available to minors in other states. We then turn to whether defendants have shown that the statute is narrowly tailored to serve those interests.

Defendants bear the burden of proving that the law furthers a compelling state interest. *Reed*, 576 U.S. at 171. Defendants assert that the aid-or-assist law furthers the state's compelling interests in protecting the parent-child relationship, family relations, and Indiana children's own well-being. The Supreme Court has weighed heavily parents' rights to be involved in their children's medical decisions and to act in their children's best interest when "difficult decisions" must be made. *Parham v. J. R.*, 442 U.S. 584, 602 (1979); see also *H. L. v. Matheson*, 450 U.S. 398, 410 (1981); *Bellotti v. Baird*, 443 U.S. 622, 633–39 (1979) (plurality). The Supreme Court has also recognized that states have "constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham*, 442 U.S. at 603. Defendants also cite the importance of parental involvement "to supply essential medical and other information to a physician." See *H. L.*, 450 U.S. at 411.

All of these are legitimate state interests, and we have no difficulty acknowledging that at least the state's interest in safeguarding the sanctity of the parent-child relationship is compelling. The fundamental problem here is that defendants have not shown that the aid-or-assist law, as applied to

plaintiff's speech about health care that is legally available in other states, is narrowly tailored to serve those interests. First, defendants have not offered evidence supporting their assertions that the aid-or-assist law would actually serve any of those state interests. Second, the aid-or-assist law is substantially overinclusive and underinclusive in terms of serving those interests. Such a poor fit between interests and measures that purportedly serve them undermines the proffered rationales and flunks strict scrutiny.

B. *The Lack of Evidence*

First, defendants have simply not supported their defense with evidence. Defendants argue there is a rational connection between the speech restriction and the asserted state interests, but they do so at too high a level of generality and without proof. Defendants claim that the aid-or-assist law is necessary because plaintiff impermissibly interferes with those interests by sharing with its minor patients information about or referrals to legal out-of-state abortion providers. "[B]ut the First Amendment demands a more precise analysis." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021).

To show that a restriction is necessary to further a compelling governmental interest, defendants "must present more than anecdote and supposition." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000); accord, *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 313–14 (2013) ("Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice … Strict scrutiny must not be strict in theory but feeble in fact.").

As our colleague on the district court explained, the defendants failed to present any evidence that the state's interests in safeguarding the parent-child relationship or protecting the physical and psychological well-being of minors would actually be furthered by prohibiting private individuals from disseminating truthful information to pregnant minors about lawful abortion practices in other states. *Planned Parenthood Great Northwest*, 732 F. Supp. 3d at 979–80. Are minors less likely to consult their parents after receiving the information at issue from plaintiff? Or conversely, does satisfaction of Indiana's parental consent requirements before receiving that information aid the parent-child relationship in ways that a less stringent consent requirement in this provision would not? Defendants offered no evidence to answer those questions.

Defendants respond instead that the aid-or-assist statute is "reasonably calculated to protect minors," quoting language from *H. L.*, 450 U.S. at 412, where the Supreme Court was satisfied that a state's parental notification statute was rationally related to legitimate state interests. But strict scrutiny compels a more precise analysis, and defendants have not shown how the statute was calculated to further the state's interests here. See *Brown*, 564 U.S. at 799–801 (rejecting state's reliance on generalized, ambiguous evidence to justify speech regulation where state could not establish "direct causal link" between speech and harm). Without supporting evidence, we cannot endorse defendants' view that the aid-or-assist law furthers the state's compelling interests.

Instead of supplying evidence to demonstrate how the law advances the state's compelling interest in the parent-child relationship, defendants point us to cases involving direct

challenges to parental consent statutes as applied to actual abortions. See *Hodgson v. Minnesota*, 497 U.S. 417, 448–49 (lead opinion) and 482 (Kennedy, J., concurring in the judgment in relevant part) (1990) (upholding statute requiring 48-hour waiting period after minor notified one parent of intent to obtain abortion; reflecting views of six Justices on the question); *H. L.*, 450 U.S. at 400, 413 (upholding statute requiring physicians to notify a minor's guardian, if possible, before performing an abortion); *Bellotti*, 443 U.S. at 626–27 (plurality) (finding unconstitutional a parental-consent statute that did not include judicial bypass procedure). We see a significant difference, however, between a parent's right to consent to or to be notified before her child receives an abortion and a parent's right to block access to accurate information about or a referral to an out-of-state provider of legal abortion care.

We also cannot square defendants' asserted interest in protecting the parent-child relationship with the strong constitutional protections given to factually accurate speech about conduct that is legal in another state. As addressed in *Bigelow*, "Virginia is really asserting an interest in regulating what Virginians may hear or read about the New York services. It is, in effect, advancing an interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers do not reach." 421 U.S. at 827–28.

The Supreme Court has further recognized that protecting the ability to disseminate factually accurate information is even more consequential in the healthcare context, where patients rely on their doctors to "make deeply personal decisions." *NIFLA*, 585 U.S. at 771, quoting *Wollschlaeger v.*

*Governor of Florida*, 848 F.3d 1293, 1328 (11th Cir. 2017) (en banc) (Pryor, J., concurring); *Sorrell*, 564 U.S. at 566 ("[I]n the fields of medicine and public health … information can save lives."). In other words, even though defendants may fiercely disagree with the less stringent parental consent requirements of neighboring states, this alone cannot justify targeting plaintiff's speech just because it is directed at minors.

C. *Overinclusive and Underinclusive*

Indiana's aid-or-assist law is not narrowly tailored to serve the state's legitimate and even compelling interest in protecting the parent-child relationship. For that interest, it is both overinclusive and underinclusive.

The first problem is the statute's requirement that plaintiff obtain, or "seek[] to obtain," consent under Indiana's stringent parental consent requirements—the standards that apply before actually having an abortion—merely to provide the information and referrals at issue. Under the aid-or-assist law, plaintiff must receive a parent's written consent form, government-issued proof of identification, and some evidence "that provides an articulable basis for a reasonably prudent person to believe" the pregnant minor and parent are related before uttering the name of a single website. See Ind. Code § 16-34-2-4(b). As Judge Scudder highlights in his concurrence, the law also requires that the parent's signature even be notarized. That requirement seems both unprecedented and extraordinary as a condition of sharing truthful information about legal activities in another state. If a pregnant minor does not wish to notify her parents, the minor must prove to a juvenile court that she is mature enough to make this decision independently, and then that it is in her best interests to obtain an abortion without parental

notification, all just to receive information about health care legally available in another state, especially where time is critical for that health care. § 16-34-2-4(e) & (f). The judicial bypass procedures evolved to apply to a minor's actually obtaining an abortion. Extending that requirement of filing a legal action as a minor before she can obtain factual information otherwise available with a quick on-line search seems to be another unprecedented and extraordinary obstacle. We are not aware of any other comparable legal limits on providing to a minor factual information about legal activity.

Defendants contend that Indiana's parental consent requirement is not complex, comparing it to what they say are similar documentation requirements to vote, to enter a federal building, or to be nominated for political office. Appellants' Br. at 42–43, citing *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) (government-issued proof of identity to vote); *United States v. Smith*, 426 F.3d 567, 573 (2d Cir. 2005) (government-issued identification required to enter federal building); *Tripp v. Scholz*, 872 F.3d 857, 866–69 (7th Cir. 2017) (nominating petitions to run for office must be notarized, but individual voters' signatures did not require notary). The aid-or-assist law requires much more than identification requirements to vote or enter a federal building. And gaining a position on a ballot is not a fair comparison to merely receiving helpful information about legal care in other states. The defendants' comparisons do not show that the details of the aid-or-assist law's requirements for proving parental consent are narrowly tailored to advance Indiana's compelling interests.

Plaintiff also points to situations in which its minor clients do not know where their parents are, risk physical or mental abuse if they try to obtain their required consent, or might be forced to carry an unwanted pregnancy to term once their parents are alerted. The state has not engaged with those effects of its statute, which, far from advancing the state's compelling interest in child welfare, would harm pregnant minors, including mature minors, by depriving them of information that could help them make a decision protecting their health and safety.

Second, the statute does not define the "seeking to obtain" provision, undermining the state's arguments for narrow tailoring. The statute is written to prohibit a Planned Parenthood physician from sharing information with a minor who has written consent from a parent, but where the signature on the written consent has not been witnessed by a notary public. Or suppose a minor patient tells Planned Parenthood that she will talk to her parents that night about getting their written consent. What about when both parents accompany the minor to the Planned Parenthood appointment but do not have satisfactory proof of identification with them? Defendants recognized at oral argument that these are close questions of fact about whether the law applies. In their reply brief, defendants recognize that "it is not clear the statute would apply." But "a law's chilling effect is particularly great when it is unclear whether that law actually forbids the contemplated activity." *Mercatus Group, LLC v. Lake Forest Hospital*, 641 F.3d 834, 847 (7th Cir. 2011). Given the scope of the provision, there is no way for plaintiff to avoid liability in practice other than to require strict adherence to Indiana's parental consent requirements.

Defendants point out that the aid-or-assist law prohibits only "knowingly or intentionally" aiding or assisting. See Ind. Code § 16-34-2-4.2(c). But if plaintiff intentionally provides information to a minor in any of the above situations, there is significant risk of liability for plaintiff and its employees if the minor actually obtains an abortion in another state. Given this uncertainty, there is great reason to anticipate a chilling effect on plaintiff's speech. The inclusion of a scienter requirement does not cure the statute's constitutional defect: it continues to impose obligations on plaintiff that are not narrowly tailored to the state's important interests.

Indiana's aid-or-assist law as applied to plaintiff is also overinclusive in that it assumes, without showing, that Planned Parenthood intentionally provides this information to help minors evade Indiana's parental consent requirements. But Planned Parenthood has identified numerous reasons why its minor patients seek this information that are not efforts to bypass parental consent and notification.

Recall that Indiana's abortion laws criminalize abortion except in the narrow cases of lethal fetal anomaly, rape, or incest, or to prevent serious health risks to the pregnant woman. Ind. Code. § 16-34-2-1(a)–(c). Since almost any abortion in Indiana would be illegal, most individuals seeking an abortion must travel out of state to obtain one. A minor need not satisfy Indiana's parental consent requirements to obtain an abortion if the abortion will not take place in the state of Indiana. If that minor is now subject to another state's parental consent requirements before obtaining an abortion, why must she first satisfy Indiana's set of requirements for obtaining an abortion just to receive related information or to be placed in contact with an out-of-state provider?

Plaintiff has further offered evidence that its minor patients do not seek abortions in other states because of less onerous parental consent requirements. Indeed, plaintiff asserts that "the overwhelming majority of minors obtaining an abortion do so with their parent's consent." Appellee's Br. at 44, citing Declaration of F. Beeley at ¶ 9 ("[I]n fiscal year 2015—the last year for which data is available—96.3% of minors who had abortions at [plaintiff] had the consent of a parent or legal guardian."). Instead, patients who would otherwise have parental consent, and who might even fit into one of Indiana's narrow exceptions for an in-state abortion, seek to go to an out-of-state provider because it is geographically closer than in-state providers, or because out-of-state care is significantly less expensive. *Id.* at 41; Smith Decl. ¶ 26. The aid-or-assist law is not narrowly tailored if it covers minors who have no intent to evade parental involvement by seeking an out-of-state abortion provider.

Further undermining the state's argument for narrow tailoring, the aid-or-assist statute is underinclusive as a means to protect the state's asserted interests. The contents of the speech at issue—information for minor patients—are readily available to a pregnant minor without help from plaintiff. The information Planned Parenthood provides (often just the name of a website) is not exclusive to plaintiff. The minor patient herself can access it easily with a computer or smartphone. And surely, even though Planned Parenthood may seek to help a patient who needs more assistance by providing referrals, placing the phone call to an out-of-state abortion provider is not something only the professionals at Planned Parenthood can do.

More fundamental, defendants do not address why the statute incorporates such stringent parental consent requirements just to receive information that can readily be found online. In this digital age, this fact undermines the state's assertions, unsupported by evidence, that prohibiting plaintiff's speech would actually further the state's asserted interest in minors' well-being. See *Reed*, 576 U.S. at 172 (noting a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited"), quoting *Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002). And we see no permissible basis upon which the state could try more broadly to prohibit a minor from seeking or receiving the information at issue here. Information about legally available health care is not comparable to pornography that can be denied to minors. See *Brown*, 564 U.S. at 792–94.

The aid-or-assist law is underinclusive in another way. Indiana asserts interests in the parent-child relationship, family relations, and children's own well-being. Its aid-or-assist law focuses only on abortion. Indiana has not explained how applying this statute to Planned Parenthood, where it forbids plaintiff from sharing its desired information about and referrals to out-of-state abortion providers, is sufficiently tailored to those interests where all other medical advice relating to the minor's pregnancy is not subject to these stringent parental consent and notice requirements. That fact also contributes to our "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* at 802.

Last, defendants assert that the state has an interest in ensuring that a treating physician has access to a minor's full medical records. Defendants have not shown how the statute helps serve this interest, let alone that it is narrowly tailored to serve it. The statute as written need not serve that interest, and there are surely other, less onerous ways to ensure that treating doctors have adequate access to a minor's records that do not involve burdening plaintiff's speech.

In a fallback argument, defendants seem to recognize the tailoring problem. They argue that even if the prohibition on providing information more generally does not advance Indiana's interests, the ban on referrals does advance those interests. For purposes of First Amendment protection, we are not persuaded there is a constitutional distinction between providing a telephone number to a minor patient and placing the call for her when she needs additional assistance.

Defendants do not challenge the remaining requirements for permanent injunctive relief, which are also satisfied here. See *eBay Inc. v. MercExchange, L. L. C.*, 547 U.S. 388, 391 (2006). First Amendment violations have long been deemed to inflict irreparable harm. See, e.g., *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020), citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality). Given the merits of plaintiff's claim, the balance of hardships weighs in favor of plaintiff, and the public interest would not be disserved by this injunction.

* * *

The district court's permanent injunction is MODIFIED so that it no longer runs against the Commissioner of the Indiana Department of Health, and as thus modified is AFFIRMED.

SCUDDER, *Circuit Judge*, concurring in the judgment. I agree with the majority that Indiana's aid-or-assist statute restricts speech on the basis of viewpoint and fails to survive strict scrutiny. In my respectful view, however, today's decision reaches this conclusion on reasoning that undervalues Indiana's compelling interest in keeping parents involved in every stage of a minor's decision about whether to get an abortion. The majority's narrow tailoring analysis also misses the mark by finding too much fault with the means Indiana chose to ensure parental involvement in such a grave and consequential decision. In my view, Indiana's statute is overinclusive solely because of its notary requirement. All of this leaves me to concur in today's judgment on this narrow ground.

**I**

A

Senate Enrolled Act 404 reflects the Indiana General Assembly's desire to give parents a central role in their children's abortion decisions. Section 4 provides that when an unemancipated minor becomes pregnant, she generally may not get an abortion unless she secures parental consent or a judicial waiver. See Ind. Code § 16-34-2-4. The consent must meet several requirements. A parent must provide the physician with (1) "notarized written consent," (2) "government issued proof of identification," and (3) "some evidence, which may include identification or other written documentation that provides an articulable basis for a reasonably prudent person to believe that the person is the parent." *Id.* § 16-34-2-4(b). A court will waive the consent requirement if it finds that "the minor is mature enough to make the abortion decision

independently or that an abortion would be in the minor's best interests." *Id.* § 16-34-2-4(f).

Indiana bolstered this parental consent requirement in section 5 of the Act. That section provides that "[a] person may not knowingly or intentionally aid or assist an unemancipated pregnant minor in obtaining an abortion" unless the minor "has obtained or is seeking to obtain: (1) parental consent; or (2) a waiver of parental consent; under section 4 of this chapter." *Id.* § 16-34-2-4.2(b), (c). Both sides agreed before the district court that this law prohibits Planned Parenthood "from providing information to young women about abortion options outside the state of Indiana where parental-involvement requirements might be less expansive."

B

I agree with the majority that section 5 targets speech instead of conduct, at least for this as-applied action. To be sure, the law resembles the one at issue in *K.C. v. Individual Members of Medical Licensing Board of Indiana*, 121 F.4th 604 (7th Cir. 2024). The statutory text "does not address speech at all." *Id.* at 630 (distinguishing *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)). Indeed, it provides that "physicians must avoid some *action*, not that they must avoid some *language*." *Id.* (distinguishing *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017)). But the Supreme Court has recently instructed that when it comes to as-applied challenges where the plaintiff "seeks to engage only in speech," then "as applied to her the law regulates what she may say." *Chiles v. Salazar*, 146 S. Ct. 1010, 1023 (2026). "Just because a law may generally function as a regulation of conduct … does not exempt it from demanding First Amendment review when a government seeks to apply that law to speech alone." *Id.* at 1025 (cleaned up).

I also agree that section 5 restricts speech based on content. That is because the provision "singles out [the] specific subject matter" of abortion. *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015). We must therefore apply strict scrutiny—"a demanding standard" that only a "rare" regulation will satisfy. *Chiles*, 146 S. Ct. at 1021 (cleaned up).

The majority is also right that section 5 restricts speech on the basis of viewpoint. It prohibits sharing information about the availability of out-of-state abortions only when the speaker seeks to "knowingly or intentionally aid or assist an unemancipated pregnant minor in obtaining an abortion," Ind. Code § 16-34-2-4.2, not when they seek to dissuade the minor from terminating her pregnancy. The statute, in short, "targets not merely a subject matter, but particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (cleaned up).

The First Amendment strongly disfavors and all but condemns viewpoint-based restrictions on speech. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virg.*, 515 U.S. 819, 829 (1995). Or, as the Court put the point more recently in *Chiles*, "[v]iewpoint discrimination … represents an egregious form of content regulation, and governments in this country must nearly always abstain from it." 146 S. Ct. at 1021 (cleaned up).

Courts are so wary of viewpoint-based discrimination that some have recognized that "there is an argument that such regulations are unconstitutional per se." *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (first citing *Rosenberger*, 515 U.S. at 829, and then citing *Members of the City*

*Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). At minimum, the Supreme Court "has at times hinted that the rule for viewpoint-based restrictions may be more stringent than for content-based restrictions." Eugene Volokh, *Freedom of Speech, Permissible Tailoring & Transcending Strict Scrutiny*, 144 U. Pa. L. Rev. 2417, 2425 n.44 (1996) (collecting cases). For our part, we have avoided announcing that viewpoint-based restrictions are per se invalid and instead evaluated them by employing strict scrutiny. See *Brown v. Kemp*, 86 F.4th 745, 783 (7th Cir. 2023). Even then, though, we must do so in a way that does "not leave a lot of breathing room for viewpoint-based speech restrictions." *Otto*, 981 F.3d at 864; see also *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018) ("Precision must be the touchstone when it comes to regulations of speech, which so closely touch our most precious freedoms." (cleaned up)).

I agree with the majority that Indiana's aid-or-assist statute falls short of this exacting standard. But I get there through very different reasoning than my colleagues. Foremost, the majority diminishes the weight of Indiana's interest underpinning section 5. It does so by relying on *Bigelow v. Virginia*, 421 U.S. 809 (1975), to support the proposition that Indiana has no authority to regulate in-state speech about the availability of out-of-state medical procedures. See Maj. Op. at 27, 39–42, 46–47. But *Bigelow* did not involve minors, nor did the Justices say anything suggesting that the case's principles extend to children. Indeed, our circuit has upheld an Indiana statute regulating when physicians may tell minor patients about the availability of gender transition procedures in other states. See *K.C.*, 121 F.4th at 628, 631, 634. It is all but impossible to see why Indiana would have less authority

when it comes to a minor considering whether to terminate a pregnancy.

Not only does Indiana have the authority to regulate this sort of in-state speech to minors, it has a compelling interest in doing so. The State's interest is in keeping parents involved in their children's most consequential, life-altering decisions, including at the information-gathering stage. The Supreme Court has recognized this interest many times over. See, *e.g.*, *Bellotti v. Baird*, 443 U.S. 622, 639 (1979) (acknowledging "the special interest of the State in encouraging an unmarried pregnant minor to seek the advice of her parents in making the important decision whether or not to bear a child"); *H.L. v. Matheson*, 450 U.S. 398, 410 (1981) ("We have recognized that parents have an important guiding role to play in the upbringing of their children, which presumptively includes counseling them on important decisions." (cleaned up)); *Hodgson v. Minnesota*, 497 U.S. 417, 444 (1990) ("The State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely."); see also *Zbaraz v. Hartigan*, 763 F.2d 1532, 1536 (7th Cir. 1985) ("The state clearly has a significant interest in promoting parental consultation with a minor before her decision to have an abortion."). All of this was true before *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and doubly so in its wake given the authority States have when it comes to regulating access to abortion.

I also part ways with the majority's narrow tailoring analysis. My colleagues insist that section 5 is overinclusive because there may be "situations in which [Planned Parenthood's] minor clients do not know where their parents

are, risk physical or mental abuse if they try to obtain their required consent, or might be forced to carry an unwanted pregnancy to term once their parents are alerted." Maj. Op. at 48. But that is exactly why Indiana included a judicial bypass. See Ind. Code § 16-34-2-4.2(b)(2) ("This section does not apply to a person who aids or assists an unemancipated pregnant minor who has obtained or is seeking to obtain … a waiver of parental consent."); see also *id.* § 16-34-2-4(f) ("The requirement of parental consent under this section shall be waived by the juvenile court if the court finds that the minor is mature enough to make the abortion decision independently or that an abortion would be in the minor's best interests.").

The majority additionally sees section 5 as underinclusive because it does not stop minors from learning about legal out-of-state abortions through a quick Google search. See Maj. Op. at 51–52. But "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). Indeed, the Supreme Court has "accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Id.* (collecting cases); see also *id.* at 452 ("The First Amendment does not put a State to that all-or-nothing choice."). I see no reason why Indiana needs to enact some sort of blanket ban on abortion-related speech that a minor might see or hear, especially given the majority believes such a law would be unconstitutional anyway. See Maj. Op. at 52 ("And we see no permissible basis upon which the state could try more broadly to prohibit a minor from seeking or receiving the information at issue here."). It is also worth remembering that this as-applied challenge concerns what licensed physicians may tell minor patients. Indiana may

understandably worry more about how a minor might receive speech from a trusted, familiar medical professional than from a more general online source.

The majority further contends that section 5 is underinclusive because it "focuses only on abortion." Maj. Op. at 52–53. It suggests that Indiana's interests in "the parent-child relationship, family relations, and children's own well-being" must be pretextual because the law does not apply to "all other medical advice relating to the minor's pregnancy." *Id.* But terminating a pregnancy is an especially "grave decision," and a minor under intense stress "may be ill-equipped to make it without mature advice and emotional support." *Bellotti*, 443 U.S. at 641. Indiana's General Assembly is free to take this view on abortion.

I agree that section 5 fails strict scrutiny for one narrow reason. To my eye, the aid-or-assist statute is overinclusive solely because of its notary requirement. Indiana not only requires a parent to prove their identity (*e.g.*, government-issued identification) and to prove their relationship with the minor (*e.g.*, birth certificate), it also requires the parent to submit "notarized written consent." Ind. Code § 16-34-2-4(b). Notaries seem to be going extinct in today's digital age and, at the very least, are not as easy to find as they were yesterday. Notice, too, that Indiana's notarization requirement means that a verified parent could expressly consent—in writing and before a witness—to a physician telling their minor child about lawful abortion in other states and still not satisfy the parental consent requirement. An alternative consent framework that allows non-notaries to serve as witnesses would sufficiently protect Indiana's interest in the parent-child relationship. See *Doe v. City of Lafayette*, 377 F.3d 757, 773

(7th Cir. 2004) ("The narrow tailoring inquiry requires that we ask whether there are other, reasonable ways to achieve the goals with a lesser burden on constitutionally protected activity." (cleaned up)).

Federalism is a cornerstone of the American experiment. As far as I can tell, Indiana has the authority to enact a more narrowly tailored version of section 5. But that choice rests with Indiana's elected representatives.

* * *

For these reasons, I CONCUR in the judgment.